# In the United States Court of Federal Claims

Nos. 14-447L, 15-510L & 16-47L (consolidated)

(Filed: December 9, 2016)

| | |
|---|---|
| \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* ) | |
| **CHRISTOPHER HARLEY-WHITE, et al.,** ) | Rails-to-Trails takings case; |
| ) | abandonment of rail use under Maine |
| **Plaintiffs,** ) | law; limited-use easements for railroad |
| ) | purposes |
| **v.** ) | |
| ) | |
| **UNITED STATES,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |
| \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* | |

J. Robert Sears, Baker Sterchi Cowden & Rice, LLC, St. Louis, Missouri, for plaintiffs. With him on the briefs were Jacqueline D. Gebhardt, Baker Sterchi Cowden & Rice, LLC, St. Louis, Missouri, and Steven M. Wald and Michael J. Smith, Stewart Wald & McCulley LLC, St. Louis, Missouri.

Joshua P. Wilson, Senior Attorney, Natural Resources Section, Environment and Natural Resources Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs was John C. Cruden, Assistant Attorney General, Environment and Natural Resources Division, United States Department of Justice, Washington, D.C.

## OPINION AND ORDER

LETTOW, Judge.

These consolidated takings cases concern the conversion of a portion of the Belfast and Moosehead Lake Railroad Line ("the Belfast & Moosehead" or "Railway") in Belfast, Maine and its attendant right-of-way into a recreational trail under Section 208 of the National Trails System Act Amendments of 1983, Pub. L. No. 98-11, § 208, 97 Stat. 42, 48 (codified at 16 U.S.C. § 1247(d)) ("Trails Act"). This change occurred upon issuance of a Notice of Interim Trail Use ("NITU") by the Surface Transportation Board ("STB") on April 30, 2014. Previously, each plot of land in question was burdened by an easement obtained pursuant to the Belfast & Moosehead's public charter, which was issued under Maine law, 1867 Me. Private and Special Laws ch. 380, at 316-23. *See* Pls.' [Proposed] Findings of Fact Ex. F, ECF 39-6. Plaintiffs are owners of twelve plots of land adjacent to the right-of-way, each of whom alleges that he or she owns a portion of the fee underlying the right-of-way. They aver that the easements were exceeded and thus destroyed, making the government liable for taking plaintiffs' property under the Fifth Amendment by authorizing use of the property as a public trail. *See, e.g.*, *Preseault v. Interstate Commerce Comm'n*, 494 U.S. 1 (1990) ("*Preseault I*") (holding that

the Tucker Act, 28 U.S.C. § 1491(a), provides a remedy for an alleged taking of a property interest in land previously used as a railroad right-of-way that had been transferred to a public entity for use as a public trail).[1]  Before the court are plaintiffs' motion for summary judgment on liability and defendant's corresponding cross-motion.

The court concludes that the government is liable to plaintiffs for the taking of plaintiffs' property after the government exceeded the scope of the former easements.  Plaintiffs' motion for summary judgment on liability is thus granted and defendant's cross-motion is denied.

## BACKGROUND

This case involves a two-mile strip of land previously used as a right-of-way for the Belfast & Moosehead in Belfast, Maine.  Pls.' [Proposed] Findings of Fact ¶ 1, ECF No. 39.[2]  It extends from milepost 0.33 at the U.S. Route 1 overpass in downtown Belfast to milepost 2.33 at Oak Hill.  *Id.*

In 1867, the State of Maine issued articles of incorporation for the Belfast and Moosehead Lake Railway Company.  1867 Me. Private and Special Laws ch. 380, at 316-23, Pls.' [Proposed] Findings of Fact Ex. F.  The articles authorized the Belfast & Moosehead to "locate, construct and finally complete, alter and keep in repair, a railway, with one or more sets of rails or tracks, with all suitable bridges, tunnels, viaducts, turnouts, culverts, drains, and all other necessary appendages, from the city of Belfast, over the most practicable route to Moosehead Lake."  *Id.* at 317.  The articles also empowered the Railway "to purchase, or to take and hold so much of the land and other real estate of private persons and corporations as may be necessary for the location, construction and convenient operation of [the] railroad," provided that the Railway compensate the property owners at a mutually agreed-upon price or through damages "as shall be ascertained and determined by the county commissioners for the county where such land or other property may be situated, in the same manner and under the same conditions and limitations as are by law provided in the case of damages by the laying out of highways."  *Id.*

Pursuant to the articles of incorporation, the Belfast & Moosehead used condemnation to obtain easements to most of the property on which it constructed the Railway.  Pls.' [Proposed] Findings of Fact ¶ 9.[3]  Each plaintiff owns a parcel of land adjacent to the right-of-way, as well

---

[1]The Fifth Amendment specifies that "private property [shall not] be taken for public use, without just compensation."  U.S. Const. amend. V.

[2]Plaintiffs have submitted proposed findings of fact, and defendant has filed a response. *See* United States' Resp. to Pls.' Proposed Statement of Uncontroverted Facts ("Def.'s Resp. to Facts"), ECF No. 43.  Where applicable, this opinion will indicate the government's disagreements with plaintiffs' proposed factual findings as noted in its response.

[3]As defendant notes, the rest of the land underlying the railroad was purchased for the "cost of land" as permitted by the Railway's articles of incorporation.  Def.'s Resp. to Facts ¶ 9; *see also* United States' Mot. for Summary Judgment on Liability and Supporting Mem. of Fact

as a fee interest under the corridor that is burdened by the easements obtained by the Belfast & Moosehead. *Id.* ¶¶ 15-38; *see also id.* ¶ 39 ("Each [p]laintiff still owns the fee interest underlying the easement at issue and at no time relinquished their fee ownership or any of their rights to the surface of the property other than the original railroad[-]purpose easement.").[4]

The Belfast & Moosehead operated the Railway from 1870 to 1925.  Pls.' [Proposed] Findings of Fact ¶ 4.[5]  It sold the Railway to the City of Belfast ("the City" or "Belfast") in 1925, which then operated the Railway regularly through the 1980s.  *Id.*  Since 1990, however, the Railway has only been used for a "closed-loop tourist excursion service run by various operators."  Pls.' [Proposed] Findings of Fact Ex. B, at 2, 20, ECF 39-2.  On June 25, 2013, the City filed with the STB a notice of exemption to abandon the Railway and the right-of-way at issue in this case.  Pls.' [Proposed] Findings of Fact ¶ 2 & Ex. B.  It amended this notice on December 9, 2013 to request a petition for exemption.  *Id.* ¶ 6 & Ex. D, ECF 39-4.  On April 30, 2014, the STB issued a NITU for the Railway.  *Id.* ¶ 7 & Ex. A, ECF 39-1.  Thereafter, on June 12, 2014, the City filed a NITU Agreement with the STB.  *Id.* ¶ 8 & Ex. E, ECF 39-5.  In this agreement, the City agreed to convert the Railway into a recreational trail.  *Id.*  The agreement also reserves to the City the potential reactivation of the Railway in the future.  *Id.*  The agreement has since been effectuated; the rails and ties have been removed from the Railway, and the trail, called the Passy Trail because of its proximity to the Passagassawakeag River, is

---

and Law ("Def.'s Cross-Mot.") Ex. 6, ECF No. 41-6 (showing that the Railway acquired the land underlying the right-of-way through condemnation, deeds, and quitclaim deeds).  The parties do not dispute that the easements to the parcels at issue in this case were acquired from plaintiffs' predecessors-in-interest through condemnation.  Pls.' [Proposed] Findings of Fact ¶ 12; Def.'s Resp. to Facts ¶ 12.

[4]The government disputes these statements to the extent that it argues that plaintiffs never owned fee simple title to the underlying right-of-way, and that the easements were highway-purpose easements rather than railroad-purpose easements.  *See* Def.'s Resp. to Facts ¶¶ 16, 18, 20, 22, 24, 26, 28, 30, 32, 34, 36, 38, 39.

[5]The Belfast & Moosehead had a memorable logo:



open to the public.  Def.'s Cross-Mot. Ex. 1 (Decl. of Joseph Slocum (Aug. 24, 2016) ("Slocum Decl."), ¶¶ 2, 14), ECF No. 41-1; Pls.' Mem. in Resp. to Def.'s Mot. for Summary Judgment on Liability ("Pls.' Resp.") at 7, ECF No. 44.

Belfast began planning the development of the Passy Trail prior to the issuance of the NITU.  As part of this planning process, the City paid for and acquired recreational trail easements from abutting landowners along the Railway "as a gesture of goodwill and to settle all doubts" regarding ownership of the trail.  Slocum Decl. ¶¶ 6, 8.  Subsequently, after some landowners filed suit in this court, however, the Belfast City Council voted to rescind those landowners' easements and reclaim the payments "because the City believed it held all rights necessary to develop the Passy Trail regardless of the easements."  *Id.* ¶ 12.  The Maine Superior Court ordered the rescission and refund on April 27, 2015.  *Id.*; *see also* Order of Apr. 27, 2015, *Lynn L. Harrison Trust v. City of Belfast*, No. RE-15-8 (Me. Super. Ct., Waldo Cnty.), a copy of which is set out at Def.'s Cross-Mot. Ex. 5, ECF No. 41-5.  The City continues to hold easements along portions of the right-of-way that are not at issue in this case.  Slocum Decl. ¶ 13.

On May 27, 2014, plaintiffs Christopher Harley-White, Kristin Robinson-White, and Eliah P. Thanhauser filed suit in this court, alleging an uncompensated taking of their property along the Railway contravening the Fifth Amendment.  *See generally* Compl.  This suit was consolidated with two other suits, *Lewis v. United States*, No. 15-510L, and *Finden v. United States*, No. 16-47L, that were brought by other plaintiffs who own property underlying the right-of-way.  *See* Order of Aug. 26, 2015, ECF No. 18; Order of Apr. 5, 2016, ECF No. 34.  Plaintiffs argue that the easements granted to the Belfast & Moosehead were terminated when the Railway ceased operations and the NITU was issued, and that but for the NITU "[p]laintiffs would have the exclusive right to physical ownership, possession, and use of their property free of any easement for recreational trail use or future railroad use."  Second Am. Compl. ¶¶ 6, 20.  According to the Claims Books submitted by plaintiffs with their proposed findings of fact, twelve distinct claims exist, each of which is associated with a named claimant (or claimants) and one or more parcels of land.  Pls.' [Proposed] Findings of Fact Exs. J and K, ECF Nos. 39-10 and 39-11.  The relevant parcels are demarcated on the Belfast tax maps submitted by the government.  *See* Def.'s Cross-Mot. Ex. 9.

The pending cross-motions for partial summary judgment on liability have been fully briefed and were addressed at a hearing on November 2, 2016.  Subsequent submissions by the parties clarified a salient question of mixed law and fact.

## STANDARDS FOR DECISION

A grant of summary judgment is warranted when the pleadings, affidavits, and evidentiary materials filed in a case reveal that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a) of the Rules of the Court of Federal Claims ("RCFC").  A material fact is one "that might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine dispute is one that "may reasonably be resolved in favor of either party."  *Id.* at 250.

The party moving for summary judgment bears the burden of demonstrating the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Consequently, "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). To establish "that a fact cannot be or is genuinely disputed," a party must "cite[] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." RCFC 56(c)(1)(A). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial,'" and summary judgment is appropriate. *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)). Because cross-motions for summary judgment are pending before the court, the court must evaluate each motion on its own merits, "taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987).

## ANALYSIS

To find a taking for which liability would arise under the Fifth Amendment in a rails-to-trails case, the court must perform a three-part analysis specified by the Federal Circuit in *Preseault v. United States*, 100 F.3d 1525 (Fed. Cir. 1996) (en banc) ("*Preseault II*"):

> (1) who owned the strips of land involved, specifically did the Railroad . . . acquire only easements, or did it obtain fee simple estates;
>
> (2) if the Railroad acquired only easements, were the terms of the easements limited to use for railroad purposes, or did they include future use as public recreational trails; and
>
> (3) even if the grants of the Railroad's easements were broad enough to encompass recreational trails, had these easements terminated prior to the alleged taking so that the property owners at that time held fee simples unencumbered by the easements.

100 F.3d at 1533; *see also Phipps v. United States*, 126 Fed. Cl. 674, 690 (2016); *Barlow v. United States*, 123 Fed. Cl. 186, 194 (2015); *Memmer v. United States*, 122 Fed. Cl. 350, 357-58 (2015). To prevail, plaintiffs must show that the railroad held only an easement on their property, and that either the easement did not encompass future use as a public recreational trail, or that the easement had terminated prior to the alleged taking. *Geneva Rock Prods., Inc. v. United States*, 107 Fed. Cl. 166, 170 (2012).

### A. Easements and Reversionary Interests under Maine Law

First, the court must determine the nature of the property interest each plaintiff would have had under Maine law in the absence of the STB's issuance of the NITU. *See Capreal, Inc. v. United States*, 99 Fed. Cl. 133, 140 (2011). A taking will occur when the conversion of a railroad right-of-way to interim trail use under the Trails Act blocks the "state law reversionary

property interests that would otherwise vest in the adjacent landowners." *Caldwell v. United States*, 391 F.3d 1226, 1233 (Fed. Cir. 2004) (citing *Preseault II*, 100 F.3d at 1552). The parties agree that the Belfast & Moosehead obtained only easements for the land underlying the right-of-way through condemnation and that plaintiffs retained a fee interest. Pls.' [Proposed] Findings of Fact ¶ 12; Def.'s Resp. to Facts ¶ 12; *see also* Pls.' Resp. at 1. However, the parties disagree regarding whether Maine law operated to terminate those easements upon the issuance of the NITU, such that unfettered ownership of the right-of-way would revert to plaintiffs.

In Maine, abandonment of rail service on a right-of-way "shall not mean or imply that the rights-of-way on a railroad line have been abandoned. In the event that the railroad, any person, firm or corporation, or any agency shows interest in the eventual restoration of service, the rights-of-way shall not be deemed abandoned." Me. Rev. Stat. Ann. tit. 23, § 7105(3)(B).[6] The government contends that the petition for exemption and the subsequent issuance of the NITU demonstrate Belfast's interest in restoring rail service along the Passy Trail, arguing that in these circumstances Maine law forecloses abandonment of the rail line and the reversion of plaintiffs' property interests. Def.'s Cross-Mot. at 12.

In support, the government cites *Dale Henderson Logging, Inc. v. Dep't of Transp.*, 48 A.3d 233 (Me. 2012), in which the Supreme Judicial Court of Maine found that a railroad right-of-way had not been abandoned upon its conversion to interim trail use because the Maine Department of Transportation ("DOT") had demonstrated an active interest in the eventual restoration of service pursuant to the predecessor statute to § 7105(3)(B). *See* Def.'s Cross-Mot. at 11.[7] After the Interstate Commerce Commission ("ICC")[8] approved the Maine Central Railroad Company's application for abandonment of the Calais Branch right-of-way and the company conveyed its interest in the right-of-way to Maine DOT, the DOT "held and managed [the corridor] for future railroad uses." *Id.* at 238 (citing § 7105(3)(C)) (internal quotation marks omitted). The court found that Maine DOT had demonstrated an interest in restoring rail service because it "had issued several requests for proposals . . . to restore service," it had annually inspected the "bridges, culverts and tracks on the corridor," and it had spent over $750,000 to maintain the corridor "in such a condition to allow for the future resumption of rail service thereon." *Id.* at 238-39. Further, the Maine legislature specifically provided by statute that Maine DOT "reserves the right to terminate at any time the use of the Calais Branch rail corridor

---

[6]The Maine State Railroad Preservation Act was adopted by the State in 1989 to "protect and promote rail transportation in order to further the general welfare." Me. Rev. Stat. Ann. tit. 23, § 7102. Section 7105 applies to "all existing and future rights-of-way created prior to or following September 30, 1989." Me. Rev. Stat. Ann. tit. 23, § 7105(3)(B).

[7]The earlier statute, Me. Rev Stat. Ann. tit. 23, § 4207(3)(B), was "substantively the same" as § 7105(3)(B). *Dale Henderson Logging*, 48 A.3d at 234 n.1.

[8]The ICC was the predecessor agency to the STB, and performed substantially the same functions with regard to railroad right-of-way abandonments and the conversion of rights-of-way to recreational trails. *See Jenkins v. United States*, 102 Fed. Cl. 598, 600 n.1 (2011).

for recreational purposes and to use the Calais Branch rail corridor for railroad purposes." *Id.* at 239 (quoting Me. Rev. Stat. Ann. tit. 23, § 7108(2)) (internal quotation marks omitted).

In contrast to the facts underpinning the result in *Dale Henderson Logging*, the court finds here that there is not sufficient evidence to conclude that any entity has demonstrated "interest in the eventual restoration of service" along the Passy Trail. The government points only to the City's general statement in its petition to the STB for exemption that the Passy Trail "may have future value as a rail transportation corridor," such that the right-of-way would be "railbank[ed]," allowing trail use "unless and until such other uses become viable." Pls.' [Proposed] Findings of Fact Ex. B, at 3. Notably, any applicant for a NITU must warrant that the right-of-way at issue will be railbanked pursuant to the Trails Act, which states that "if such interim [trail] use is subject to restoration or reconstruction for railroad purposes, such interim use shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes." 16 U.S.C. § 1247(d); *see also Caldwell*, 391 F.3d at 1229-30 (explaining that a petition for exemption to abandon a right-of-way under the Trails Act must include, among other things, "an acknowledgement that the right-of-way may be reactivated for railroad use in the future") (citing 49 C.F.R. § 1152.29(a)). To receive a NITU, future railroad use along the right-of-way must merely be a possibility; no entity need show actual "interest" in such future use. In this instance, the City's representation in the petition to the STB is sufficient to satisfy the Trails Act standard, but is not sufficient to forestall abandonment under Me. Rev. Stat. Ann. tit. 23, § 7105(3)(B).

In *Dale Henderson Logging*, Maine DOT had spent significant time, money, and effort to preserve the Calais Branch corridor for future railroad purposes. 48 A.3d at 238-39. In the case of the Passy Trail, however, Belfast has made no actual effort to preserve the corridor. Rather, the City has spent its time, money, and effort to fully convert the right-of-way into a trail. Since the issuance of the NITU, the rails and rail equipment have been pulled up from the right-of-way and it has been paved for use as a recreational trail. *See* Slocum Decl. ¶ 14; Hr'g Tr. 24:6-10 (Nov. 2, 2016).[9] Belfast also "has not been approached by any railroad, shipping company or industrial or commercial entity wishing to use the line for transportation purposes," and no rail excursion service has been contemplated. Pls.' [Proposed] Findings of Fact Ex. B, at 15. Finally, there is no legislative grant from the State of Maine to provide explicitly for future railroad use along the Passy Trail as there was in *Dale Henderson Logging*. The mere statement that the corridor may be used as a railroad at some indeterminate time in the future is insufficient to constitute "interest in the eventual restoration of service" under Me. Rev. Stat. Ann. tit. 23, § 7105(3)(B) and *Dale Henderson Logging*. Therefore, the right-of-way should be deemed abandoned under Maine law, terminating the easements that were granted to the Belfast & Moosehead by plaintiffs' predecessors-in-interest.

The government's contention also fails for a separate, independent reason. Even if abandonment of the railroad right-of-way had been forestalled under Maine law, the conversion to interim trail use would still constitute a taking if the trail use was beyond the scope of the

---

[9]The date will be omitted from subsequent citations to the transcript of the hearing held on November 2, 2016.

easements. In *Preseault II*, the court addressed a Vermont statute that required the state to retain unused railroad rights-of-way and maintain them for public use "not inconsistent with future transportation purposes" – essentially, state-mandated railbanking. 100 F.3d at 1551. The Federal Circuit determined that even though the Vermont statute effectively prevented the reversion of any easements over the rights-of-way to the fee owners, it did not foreclose these owners from bringing takings claims because the statute was "wholly silent on the question of compensation." *Id.*; *see also Capreal*, 99 Fed. Cl. 133, 141-43 (holding that a Massachusetts statute permitting the state to acquire easements in railroad rights-of-way allowed abutting landowners who owned the underlying fee to bring takings claims if the state's use went beyond the scope of the easements because the statute did not speak to the issue). Similarly here, in some circumstances, § 7105(3)(B) provides for railbanking of rights-of-way that otherwise would have been abandoned, but it does not address compensation for the servient landowners in the event that interim use of the land exceeds the scope of the original railroad easements. Therefore, even under the assumption that the issuance of the NITU forestalled abandonment and prevented the reversion of the servient owners' property interests in the railroad right-of-way under Maine law, interim trail use would still constitute a taking without just compensation if such use is beyond the scope of the original Belfast & Moosehead easements.

### B. Limited-Use Easements for Railroad Purposes

A taking occurs in a rails-to-trails case "when government action destroys state-defined property rights by converting a railway easement to a recreational trail, if trail use is outside the scope of the original railway easement." *Ladd v. United States*, 630 F.3d 1015, 1019 (Fed. Cir. 2010). The government contends that the easements granted to the Belfast & Moosehead were for highway purposes rather than railroad purposes, and further asserts that recreational trail use falls within the scope of the easements regardless of whether they were granted for railroad purposes or highway purposes. Def.'s Cross-Mot. at 12-15; United States' Resp. to Pls.' Mot. for Summary Judgment on Liability ("Def.'s Resp.") at 5-9, ECF No. 42; United States' Reply in Support of Its Mot. for Summary Judgment on Liability ("Def.'s Reply") at 9-10, ECF No. 45. The court looks to the law of Maine to determine the scope of the easements, rather than federal law, because the easements were obtained under the state-issued articles of incorporation of the Railway. *See Capreal*, 99 Fed. Cl. at 143-44 (explaining that the scope of an easement granted under state law is a matter of state law) (citing *Toews v. United States*, 376 F.3d 1371, 1377-79 (Fed. Cir. 2004); *Chevy Chase Land Co. v. United States*, 230 F.3d 1375 (Table), 1999 WL 1289099, at *3 (Fed. Cir. 2000); *Preseault II*, 100 F.3d at 1541-44).

The articles of incorporation of the Belfast & Moosehead granted the Railway the right "to purchase, or to take and hold so much of the land and other real estate of private persons and corporations as may be necessary for the location, construction and convenient operation of [the] railroad." 1867 Me. Private and Special Laws ch. 380, at 317. For the Railway to obtain this land, the articles provided:

> [I]n all cases said corporation shall pay for such lands, estate or materials so taken and used, such price as they and the owner or respective owners thereof may mutually agree on; and in case said parties shall not agree, then said corporation shall pay such damages as shall be ascertained and determined by the county commissioners for the county where

such land or other property may be situated, in the same manner and under the same
conditions and limitations as are by law provided in the case of damages by the laying out
of highways.  And the land so taken by said corporation shall be held as lands taken and
appropriated for public highways.

*Id.*  Plaintiffs argue that the text of the articles indicates that the land was to be taken for the
specific purpose of building and operating the railroad.  *See* Pls.' Resp. at 9-10.  The government
counters that plaintiffs' predecessors-in-interest "were paid for the taking of a public highway"
when the land was originally condemned, thus transforming the railroad-purpose easement into a
highway easement.  Def.'s Cross-Mot. at 3.

In *Stuart v. Fox*, 152 A. 413 (Me. 1930), the Supreme Judicial Court of Maine analyzed
easements obtained by a railroad under a similar railroad charter.  The railroad charter at issue in
*Stuart* was identical in relevant part to the Belfast & Moosehead articles of incorporation.  *See*
1846 Me. Laws ch. 369, at 488, attached to Pls.' Reply as Ex. 1, ECF No. 46-1.  In determining
whether a conveyance of abutting property included the railroad right-of-way, the court
determined that the "highway rule" – that is, the "well-established principle" that "a conveyance
of land bounded on a highway, the fee of which is owned by the grantor, carries title to the center
of it, unless a contrary intent appears" – did not apply to railroad rights-of-way.  *Stuart*, 152 A. at
414, 417.  The court distinguished highway easements from railroad easements, stating that a
grantor of a railroad easement has no use of the right-of-way abutting his property while a
grantor of a highway easement can generally use the highway for ingress and egress.  *See id.* at
417-18.  Further, the charter language stating that the railroad held its right-of-way "as lands
taken and appropriated for public highways" (which is identical to the language in the Belfast &
Moosehead articles of incorporation) was deemed to "not mean to imply that [the railroad's]
right[-]of[-]way was in all respects similar to a highway, but merely that it held it as an easement
devoted to the public use in distinction from an ownership in fee."  *Id.* at 418.

In this instance, the Belfast & Moosehead was authorized to take property for the purpose
of building and maintaining a railroad, not for a public highway generally.  *Stuart* distinguishes
highway easements from railroad easements based on the nature of the dominant estate owner's
use of the land, and this distinction does not turn on the use of "public highways" in the language
of the charter.  Rather, as the court stated in *Stuart*, that language merely indicates that the
railroad, as the holder of the dominant estate, shall take the land as an easement rather than
outright owning it in fee.  Therefore, the court finds that the easements granted by plaintiffs'
predecessors-in-interest under the Belfast & Moosehead's articles of incorporation were railroad-
purpose easements.

Because the easements were held for a railroad purpose, the transformation of the right-
of-way into a recreational trail goes beyond the scope of the easements and constitutes a taking.
Under Maine law, "a legislative grant of the power to take by eminent domain must be construed
strictly against the donee of that power to ensure that no greater interest in land is acquired than
is minimally necessary to the purpose of the grant."  *Lage v. Phillips Historical Soc'y*, No. CV-
83-44, 1985 Me. Super. LEXIS 22, at *3 (Me. Super. Ct. Feb. 6, 1985).  In *Lage*, the Maine
Superior Court determined that a legislative grant to a railroad allowing for condemnation "as
may be necessary or convenient for the location or construction, and convenient for the operation

of [the] [r]ailroad" only allowed for a railroad purpose easement. *Id.* at *3-4. This easement thus expired upon the discontinuation of its use for railroad purposes. *Id.* at *4. Similarly, the easements here must be construed under Maine law to authorize only the use of the right-of-way for railroad purposes. Trail use does not fit within this construction.[10]

The government relies on *Briggs v. Lewiston & Another*, 10 A. 47 (Me. 1887), for the proposition that plaintiffs, "having been paid once for the right to run trains over their property," should not be compensated again for changes in the types of vehicles or traffic patterns that pass over the right-of-way. Def.'s Reply at 9. The government argues that railroad easements convey greater rights to grantees than highway easements, and thus "less technologically advanced, less intrusive, and simpler modes of transportation" than trains must be within the scope of a railroad easement. *Id.* This proposition is not supported by Maine law. In *Briggs*, a company built a "street railroad," also called a "horse railroad,"[11] on a highway, the right-of-way for which had previously been condemned as a public highway easement. 10 A. at 47-48. The court found that the street railroad did not exceed the scope of the easement because the land was still being used as a highway, albeit also as a street railroad. *Id.* at 48. A highway easement was broad enough, the court reasoned, to encompass technological improvements that would "facilitate [the land's] use as a highway." *Id.* The street railroad therefore was "a change in the mode, but . . . not a change in the use" of the highway easement. *Id.*

It cannot be said, however, that using the right-of-way for a recreational trail rather than a railroad is merely "a change in the mode." Pursuant to *Lage*, the easement granted to the Railway under the articles of incorporation must be construed to encompass only railroad purposes; that is, the easement is limited solely to transportation via trains. 1985 Me. Super. LEXIS 22, at *3. Hiking, biking, and sightseeing over a trail that is paved and without rails are uses outside the scope of the limited railroad-purpose easement, even if the new means of travel are more primitive forms of transportation than a railroad.

Further still, Maine law would bar the government's position even if the easement were for a public highway rather than for railroad purposes. A recreational trail would fall outside the scope of a public highway easement under Maine law. In *Briggs*, the street railroad at issue was deemed within the scope of a public highway easement because "[t]he laying down [of] rails in the street, and the running [of] street cars over them for the accommodation of persons desiring to travel on the street, is only a later mode of using the land as a [high]way; using it for the very purpose for which it was originally taken. . . . The land is still used for a highway." *Briggs*, 10 A. at 48. The Supreme Judicial Court in *Briggs* identified multiple forms of transportation, from "an occasional rude cart" to "wagons, drays, coaches, [and] omnibuses," that would be within the

---

[10]Railbanking of the corridor for potential future railroad use also is not within the narrow scope of the railroad purpose easement. *See Toews*, 376 F.3d at 1381 (holding that railbanking does not change the analysis of whether interim trail use is within the scope of a railroad purpose easement when a plan for future railroad use is merely speculative).

[11]A "street railroad" or "horse railroad" consisted of cars on rails that were pulled by animals, usually horses. A few horse railroads remain in limited use today, including replicas at Disneyland and the Magic Kingdom at Disney World.

scope of the public highway easement because they would all be used for travel along the highway. *Id.* Notably, however, recreation is outside the scope of travel upon public highways. The public's right to use a highway is limited to "the right to pass and repass thereon," without regard to the purpose or mode of such travel. *Stinson v. City of Gardiner*, 42 Me. 248, 253-54 (1856). The court in *Stinson* specifically noted that use of a public highway for "sport" or as a "play-ground" is outside the scope of this right because those uses cannot be classified as travel or transportation along the highway. *Id.* at 254-55. Recreation is thus a "change in the use" rather than a "change in the mode" of transport upon a public highway, and the change in use would serve to extinguish a highway-purpose easement. *Briggs*, 10 A. at 48; *see also Preseault II*, 100 F.3d at 1542-43 ("Although a public recreational trail could be described as a roadway for the transportation of persons, the nature of the usage is clearly different. In the one case, the grantee is a commercial enterprise using the easement in its business, the transport of goods and people for compensation. In the other, the easement belongs to the public, and is open for use for recreational purposes, which happens to involve people engaged in exercise or recreation on foot or on bicycles."); *Capreal*, 99 Fed. Cl. at 144 ("[T]his [c]ourt finds that a recreational trail use is outside the scope of easements for public travel. A railroad, or a highway for public travel, has the primary purpose of transporting goods and people. The purpose of a recreational trail is fundamentally different. A bicycle trail does not exist to transport people but rather to allow the public to engage in recreation and enjoy the outdoors. The two uses are distinct and an easement for a recreational trail is not like in kind to an easement for railroads.").

Contrary to the government's assertions, the Passy Trail was intended to be used for recreation rather than as a public highway, and is currently being used as such. The notice of exemption filed by the City of Belfast states that the "best current use" of the Railroad Line is as a "scenic recreational walking and bicycle trail." Pls.' [Proposed] Findings of Fact Ex. B, at 3. Further, according to Joseph Slocum, City Manager of Belfast, citizens have begun using the trail for "walking, jogging, and recreating" as well as "pushing folks in wheel chairs along its hard stone mix surface to enjoy the experience." Slocum Decl. ¶ 14. These uses are recreational, not for transporting visitors along the right-of-way from point A to point B. The recreational purpose for the Passy Trail thus exceeds the scope of the original easements, even if these easements were in fact granted for highway purposes. Therefore, each of the government's several arguments respecting trail use fails, and the government is liable to plaintiffs for a taking of their property without just compensation.

## CONCLUSION

For the reasons stated, plaintiffs' motion for summary judgment on liability is GRANTED and defendant's cross-motion is DENIED. Pursuant to a joint status report previously filed by the parties, the parties are directed to submit a proposed schedule for trial preparatory steps in the damages phase of litigation on or before January 5, 2017.

It is so **ORDERED**.

s/ Charles F. Lettow
Charles F. Lettow
Judge